IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**FILED**

6/22/2026

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVAN

UNITED STATES OF AMERICA

v.

ABDOU JALLOW

ALICIA MASTRANTONI

Magistrate No. 26-1005
**[UNDER SEAL]**

Magistrate No. 26-1006
**[UNDER SEAL]**

## AFFIDAVIT FOR CRIMINAL COMPLAINT

I, Grant E. Friday, III, Assistant Special Agent-In-Charge with the United States Department of Agriculture (USDA), Office of Inspector General (OIG), being duly sworn, depose and state as follows:

### INTRODUCTION

1.      This affidavit is made in support of a criminal complaint charging Abdou JALLOW and Alicia MASTRANTONI with Food Stamp Fraud/Trafficking, in violation of Title 7, United States Code, Sections 2024(b) and (c).

2.      I am an Assistant Special Agent-in-Charge with the United States Department of Agriculture (USDA), Office of Inspector General ("OIG"). I began as a Special Agent with USDA-OIG in July of 2010. I am currently assigned to the Pittsburgh, Pennsylvania residence office. Prior to my position with USDA-OIG I was a Special Agent for the United States Department of Homeland Security, Immigration and Customs Enforcement (US ICE) from March of 2003 until July of 2010. As a USDA Special Agent, my responsibilities include investigating violations within programs sponsored by the USDA, including investigations

1

involving unlawful Electronic Benefits Transfer (EBT) Supplemental Nutrition Assistance Program ("SNAP" or "the Program") trafficking and unlawful presentation of benefits for redemption.  During my employment with the USDA, I have been involved in numerous investigations of suspected violations of SNAP laws, including serving as the lead agent in over forty-five SNAP fraud cases.  I have participated in the execution of search warrants in connection with those investigations.

3.        I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

4.        The facts set forth in this Affidavit are based upon my personal observations, my training and experience, as well as information obtained from various law enforcement personnel and witnesses with knowledge of the alleged violations being investigated.  I have set forth only the facts necessary to establish probable cause to believe that Abdou JALLOW, previously a manager at 7-Eleven; and Alicia MASTRANTONI, previously and employee at 7-Eleven were engaged in SNAP trafficking in violation of Title 7, United States Code, Sections 2024 (b) and (c) ("Subject Offenses").  However, I have not omitted any fact that may tend to undermine a finding of probable cause.

5.        This affidavit is being submitted in support of a Criminal Complaint and arrest warrants against defendants, Abdou JALLOW and Alicia MASTRANTONI, charging them with violating Subject Offenses based upon each of them exchanging Food Stamps (SNAP benefits) for cash in violation of the applicable program's rules and regulations, and thus, violating Title 7, United States Code, Sections 2024 (b) and (c).

6.      In summary, based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of Subject Offenses were committed by JALLOW and MASTRANTONI.

**PROBABLE CAUSE**

7.      In 1964, the Food Stamp Act (hereafter, "the Act") was passed by Congress to provide low-income households with food stamp coupons for the purchase of food from retail and wholesale stores and vested the United States Department of Agriculture ("USDA") with authority to promulgate regulations for the efficient administration of the program.

8.      In 2008, the program was renamed the "SNAP" or Supplemental Nutrition Assistance Program (or "Program"). The Program uses tax dollars to subsidize low-income households, helping low-income individuals and families to maintain more nutritious diets by increasing the food purchasing power of eligible households.

9.      The USDA Food and Nutrition Service ("FNS") administered the SNAP program through retail food stores that have been approved for participation in the Program to sell food in exchange for SNAP benefits.

10.     Under Chapter 51, Title 7 of the United States Code, and regulations issued there-under, a business that accepts SNAP benefits must do so only in connection with retail sales of eligible food products and must be authorized by FNS as a retail food store.  According to USDA regulations, most edible items, except for hot prepared foods, vitamins and medicines, are eligible for purchase with SNAP benefits.  Items such as beer, cigarettes, paper goods, soaps and detergents are ineligible for purchase with SNAP benefits. Federal law specifies that a purchase made utilizing the Program benefits must be tax exempt.  SNAP benefits may not lawfully be exchanged for cash or used to pay off credit accounts or loans.

11. To participate in the Program, the owner/operator of a retail food store must first apply for authorization and complete an application in which the applicant identifies the retail food store's address, hours of business, estimated or actual annual gross sales and food sales, ownership and other pertinent information. Upon authorization to participate in the Program, the retailer is sent a hardcopy of the SNAP "Training Guide for Retailers" and links to training videos available on the FNS SNAP website. The pertinent rules and regulations relating to the Program are explained in the written guide and the videos. The "Training Guide for Retailers," is also available for review on the FNS SNAP website. In the application itself, a summary of pertinent Program rules and regulations are listed in bullet-point format on the last page. The listed rules advise the applicant that they will receive Program training materials, and it is their responsibility to ensure that the materials are reviewed and followed by all store owners and employees.

12. The listed rules further advise that it is a violation of Program regulations to exchange SNAP benefits for cash, to accept SNAP benefits for as payment for ineligible items, or as payment on credit accounts or loans. A retail applicant is required to certify his/her understanding of the listed rules and regulations by signing directly below the listed rules.

13. Once authorized to participate in the Program, the retail store establishes an account with an (Electronic Benefits Transfer) EBT processor and utilizes a terminal or computerized register system for processing (swiping) EBT cards. The EBT processor electronically deposits the proceeds from SNAP transactions into the participating retail store's bank account.

14. EBT SNAP recipients are issued a card, similar to a debit card or ATM card. To make an eligible food purchase, the recipient's EBT card is swiped through an EBT terminal/register system authorized to the retailer pursuant to the Program. After the recipient enters a Personal Identification Number ("PIN"), the EBT terminal verifies the PIN, determines

whether the recipient's account balance is sufficient to cover the proposed purchase and informs the retailer whether the transaction should be authorized or denied. If the transaction is authorized, the amount of the purchase is deducted electronically from the SNAP benefits reserved for the recipient. The retailer subsequently is paid the amount of the EBT purchase through an electronic transfer of funds from the United States government through the EBT processor to the retailer's designated bank account. The USDA maintains a report of all retailers' SNAP redemptions.

15. Title 7, United States Code, Section 2024 provides, in pertinent part:

(b) [W]hoever knowingly uses, transfers, acquires, alters, or possesses benefits in any manner contrary to this chapter or the regulations issued pursuant to this chapter shall, if such benefits are of a value of $5,000 or more, be guilty of a felony and shall be fined not more than $250,000 or imprisoned for not more than twenty years, or both, and shall, if such benefits are of a value of $100 or more, but less than $5,000, or if the item used, transferred, acquired, altered, or possessed is an benefit that has a value of $100 or more, but less than $5,000, be guilty of a felony and shall, upon the first conviction thereof, be fined not more than $10,000 or imprisoned for not more than five years, or both . . . .

(c) [W]hoever presents, or causes to be presented, benefits for payment or redemption of the value of $100 or more, knowing the same to have been received, transferred, or used in any manner in violation of the provisions of this chapter or the regulations issued pursuant to this chapter, shall be guilty of a felony and, upon the first conviction thereof, shall be fined not more than $20,000 or imprisoned for not more than five years, or both . . . .

5

16.     Moreover, 7 C.F.R. § 278.2 states that food stamp coupons may be accepted by an authorized retail food store only in exchange for eligible food and prohibits an authorized retail food store from accepting food stamp coupons for any other nonfood use.  7 C.F.R. 271.2 defines "coupons" as, among other things, access devices, including [an] electronic benefit transfer card.

17.     As a result of my training and experience, I have become familiar with a number of schemes employed by individuals and entities to defraud the Program, including a scheme known as "SNAP trafficking."

18.     SNAP traffickers purchase EBT SNAP benefits at a rate less than their full value, typically 50 to 70 percent.  For example, a retailer illegally purchasing EBT SNAP benefits would buy $100.00 in SNAP benefits for $50.00 in cash. This practice results in profiteering by traffickers, misuse of government funds intended to provide food for needy families and the creation of a market for stolen or fraudulently obtained food stamp benefits.

19.     To monitor traditional food stamp fraud by authorized retail stores, the Program uses a computer system referred to as "ALERT," or the Antifraud Locator using EBT Retailers' Transactions.  Through ALERT, the USDA can monitor and track every electronic transaction completed by a food stamp recipient.  The monthly transactions of participating retail stores are then scanned to identify fraudulent transaction patterns.

20.     In or around June 2022, my office began an investigation into the fraudulent purchase and use of SNAP benefits by the owners/operators/employees of a 7-Eleven convenience store located at 643 Liberty Avenue, Pittsburgh, Pennsylvania 15222 ("7-Eleven" or "target 7-Eleven").  The 7-Eleven possessed a license from the FNS to accept and redeem food stamps for eligible products.

21.     The 7-Eleven was flagged as a store that had a significantly high amount, both in

6

volume and value, of SNAP transactions indicating potential fraud. Your affiant's initial review of 7-Eleven's SNAP redemptions revealed hundreds of individual SNAP transactions in excess of $100 at the store, with numerous transactions exceeding $500.

22. Based on my training and experience, the frequency of these large dollar transactions was not consistent with the legitimate purchase of eligible food items with SNAP benefits at the 7-Eleven. As a result of these findings, my office initiated an investigation into the 7-Eleven's suspected SNAP trafficking activities.

23. During the times relevant to this investigation, the owners of the target 7-Eleven MM and MP resided in Virginia and the store was managed by JALLOW. This investigation has not revealed any evidence showing knowledge or involvement of MM or MP in the Subject Offenses.

24. In addition to learning that JALLOW was the manager of the 7-Eleven, I also learned that MASTRANTONI was an employee of the 7-Eleven.

25. As part of the investigation, law enforcement interviewed a patron of the target 7-Eleven who reported that she was approached by "Abdul" about "selling food stamps." She stated that "Abdul" would debit her SNAP benefits in exchange for cigarettes and "other things" at the 7-Eleven. When asked how she knew about "Abdul," she stated that it was known around that downtown area, especially at the local drug rehab/methadone clinic.

26. Law enforcement interviewed prior employees of the 7-Eleven who stated that JALLOW and MASTRANTONI exchanged SNAP benefits for cash with customers. Two prior employees stated that they also sold their personal SNAP benefits to JALLOW at 7-Eleven. One employee stated that the customers exchanging SNAP benefits for cash were drug addicts and were using the cash to purchase drugs.

27.     As part of the investigation, I became aware that 7-Eleven employees, including JALLOW and MASTRANTONI, entered the Universal Product Code (UPC) for items purchased at the 7-Eleven into the store's point of sale/cash register system.

28.     I further discovered that JALLOW and MASTRANTONI, utilized a UPC assigned to a "dummy item" that had been set up in the store's register system as "face mask" for purchases on the point of sale/cash register system to exchange SNAP benefits for cash and conceal the nature of these prohibited transactions.

29.     Under their register logins, JALLOW had a total of approximately $110,563.43 of EBT SNAP purchases entered under the "face mask" UPC and MASTRANTONI had a total of approximately $39,381.08 of EBT SNAP purchases entered under the "face mask" UPC from September 2022 through November 2022.

30.     I further learned that from in and around July 2020 through in and around December 2022, EBT SNAP purchases entered using the "face mask" UPC under JALLOW's register login totaled approximately $572,542.64. From in and around May 2021 through in and around December 2022, EBT SNAP purchases entered using the "face mask" UPC under MASTRANTONI's register login totaled approximately $59,066.63.

31.     As part of this investigation, an undercover Pennsylvania State Police Trooper (hereinafter referred to as "UCT"), made undercover exchanges of SNAP benefits for cash with JALLOW and MASTRANTONI at 7-Eleven.

32.     During the time period of September 21, 2022, to November 23, 2022, the UCT entered 7-Eleven on a number of occasions. Over the course of four occasions, the UCT exchanged a total of approximately $479.76 in EBT SNAP benefits for $240.00 in cash with JALLOW and on one occasion, the UCT exchanged approximately $100 in EBT SNAP benefits for $50.00 in

8

cash with MASTRANTONI.

33.    By way of example, on or about September 21, 2022, the UCT made a legitimate food purchase at 7-Eleven using SNAP benefits.  A short time later, the UCT observed the employee ("E1") who had just handled his/her transaction outside the store smoking a cigarette. The UCT approached E1 and asked if he/she could sell "food stamps."  E1 told the UCT, "Not to me. . . Come back in twenty minutes."  Approximately eighteen minutes later, the UCT reentered 7-Eleven and made eye contact with E1.  E1 spoke in a foreign language and got the attention of JALLOW.  The UCT approached JALLOW and asked if he/she could "get 60?"  JALLOW made entries on the register, the UCT swiped an EBT card, and JALLOW handed the UCT $30 U.S. Currency.

34.    Again, on or about September 26, 2022, the UCT entered the 7-Eleven, selected food items and approached E1 who was behind the register.  The UCT asked E1 if "he" was working.  E1 told the UCT "stay" and then completed the transaction for the legitimate food items. The UCT remained in the store.  The UCT observed MASTRANTONI in the store and E1 spoke with MASTRANTONI. E1 motioned for the UCT to come to the register at the far end of the counter. MASTRANTONI asked the UCT, "How Much?" To which the UCT replied, "One hundred." MASTRANTONI made entries on the register, and the UCT swiped an EBT card. MASTRANTONI then handed the UCT $50 U.S. Currency.

35.    On or about October 12, 2022, the UCT entered the 7-Eleven, and made a legitimate food purchase.  The UCT observed JALLOW waiting on customers using the register at the far end of the counter.  The UCT approached JALLOW and asked if he/she, "could get 120?" JALLOW made entries on the register, the UCT swiped an EBT card, and JALLOW handed the UCT $60 U.S. Currency.

36.     On or about November 7, 2022, the UCT entered the 7-Eleven, selected a food item and approached JALLOW who was working behind a register.  The UCT asked if he/she, "could get 100?" JALLOW asked, "100 for 50?" The UCT replied, "Yea."  JALLOW made entries on the register, the UCT swiped an EBT card, and JALLOW handed the UCT $50 U.S. Currency.

37.     On or about November 23, 2022, the UCT entered the 7-Eleven, and selected two food items.  The UCT approached JALLOW, who was working one of the registers.  JALLOW scanned the two food items and UCT asked JALLOW if he/she could "get 200?"  JALLOW asked, "2 for 1?" to which the UCT replied, "Yeah."  JALLOW assisted the UCT with swiping the EBT card as the UCT was having trouble with the EBT machine.  JALLOW handed the UCT $100 U.S. Currency.

38.     On or about December 21, 2022, the UCT entered the 7-Eleven, and selected food items.  The UCT made eye contact with employee, BT.  BT got the attention of MASTRANTONI, who was walking past the UCT.  The UCT advised that MASTRANTONI appeared to recognize him/her and stated, "He quit doing it awhile ago, a couple weeks ago. He don't do it no more." Based upon prior transactions and the facts discussed above, I believe that MASTRANTONI was referring to JALLOW and him exchanging SNAP benefits for cash.

39.     Through my training and experience, I know that the SNAP redemptions at this 7-Eleven were excessive. The 7-Eleven did not stock grocery items consistent with hundreds of customers making large dollar SNAP transactions. By way of comparison, from May 2021 through December 2022, the target 7-Eleven conducted approximately 4,257 SNAP transactions of $50 or more (totaling  $700,394.48) while another "comparative 7-Eleven" store approximately 2 blocks away conducted 61 such transactions (totaling $3,717.02).

40.     Furthermore, at the target 7-Eleven,  2,473 of these transactions were $100 or more

10

while the "comparative 7-Eleven" had none.  Additionally, 312 of the target 7-Eleven's SNAP transactions were $400 or more, with the largest SNAP transaction being $804.39 occurred under JALLOW's register login.

41.     It is believed that the majority of SNAP transactions over $50 at the target 7-Eleven were customers exchanging SNAP benefits for cash.  Based upon my training and experience, I believe the above EBT transaction patterns are another indicator that JALLOW and MASTRANTONI through 7-Eleven, were defrauding the SNAP program.

42.     Further, through my investigation, I learned that MASTRANTONI, herself, was a recipient of SNAP benefits, and therefore, was aware of the rules and regulations of the Program, including that SNAP benefits could not be exchanged for cash.

43.     Further, I believe that JALLOW and MASTRANTONI both were aware that SNAP benefits could not be exchanged for cash, and thus, utilized the "face mask" UPC to conceal the nature of the SNAP EBT/cash transactions.

44.     Analyzing the SNAP EBT redemptions and "face mask" UPC data for JALLOW and MASTRANTONI at 7-Eleven, it is believed the SNAP fraud/trafficking may have resulted in the trafficking of over $500,000 in SNAP benefits from July 2020 through December 2022.

**<u>CONCLUSION</u>**

45.     Based upon the evidence to date and my training and experience, there is probable cause to believe that JALLOW and MASTRANTONI exchanged SNAP benefits for cash and committed SUBJECT OFFENSES, specifically Title 7, United States Code, Section 2024(b) and (c).

46.     WHEREFORE, your deponent respectfully requests that a criminal complaint be issued against Abdou JALLOW and Alicia MASTRANTONI.

47. The above information is true and correct to the best of my knowledge, information, and belief.

## REQUEST FOR SEALING

48. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing these documents is necessary because the items and information to be seized are relevant to an ongoing criminal investigation that is neither public nor known to the target(s) of the investigation.

49. Accordingly, there is good cause to seal these documents because their premature disclosure may give target(s) an opportunity to flee, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

50. The above information is true and correct to the best of my knowledge, information, and belief.

/s/ Grant E. Friday, III
Grant E. Friday, III
Assistant Special Agent-in-Charge
United States Department of Agriculture
Office of the Inspector General

Sworn to before me, by *telephone*,
pursuant to Fed. R. Crim. P. 41(b)(2)(A),
this 22nd day of June, 2026.

This matter shall remain under seal until
further order of the court.

_____
HONORABLE PATRICIA L. DODGE
UNITED STATES MAGISTRATE JUDGE